# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| GREGORY BROWN, derivatively and on behalf of CATALENT, INC., | Case No.: |
| Plaintiff, | |
| v. | **DEMAND FOR JURY TRIAL** |
| JOHN CHIMINSKI, ALESSANDRO MASELLI, THOMAS CASTELLANO, MADHAVAN BALACHANDRAN, MICHAEL J. BARBER, J. MARTIN CARROLL, ROLF CLASSON, ROSEMARY A. CRANE, JOHN J. GREISCH, CHRISTA KREUZBURG, GREGORY T. LUCIER, DONALD E. MOREL, JR., JACK STAHL, and PETER ZIPPELIUS, | |
| Defendants, | |
| and | |
| CATALENT, INC., | |
| Nominal Defendant. | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Gregory Brown ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Catalent, Inc. ("Catalent" or the "Company"), files this Verified Shareholder Derivative Complaint against defendants John Chiminski ("Chiminski"), Alessandro Maselli ("Maselli"), Thomas Castellano ("Castellano"), Madhavan Balachandran ("Balachandran"), Michael J. Barber ("Barber"), J. Martin Carroll ("Carroll"), Rolf Classon ("Classon"), Rosemary A. Crane ("Crane"), John J. Greisch ("Greisch"), Christa Kreuzburg ("Kreuzburg"), Gregory T. Lucier ("Lucier"), Donald E. Morel, Jr. ("Morel"), Jack Stahl

("Stahl"), and Peter Zippelius ("Zippelius") (collectively, the "Individual Defendants," and together with Catalent, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Catalent, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by the Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Catalent, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by the Individual Defendants from August 30, 2021 to October 31, 2022, both dates inclusive (the "Relevant Period").

2.      Catalent is a global provider of delivery technologies, development, drug manufacturing, biologics, gene therapies, and consumer health products. The Company operates over fifty facilities worldwide and provides various services to clients which involve delivery technologies for drugs, including pre-filled syringes and vials.

2

3.      The Company operates its business under two segments: (1) Biologics, which provides manufacturing and other services for treatments developed from proteins, viruses, blood, and living organisms, including COVID-19 treatments; and (2) Pharma and Consumer Health ("PCH"), which is responsible for the mass production of pills and gummies. The Biologics and PCH segments each generate approximately 50% of the Company's total revenue.

4.      Catalent's direct customers, referred to as "channel partners," are ordinarily pharmaceutical companies—including, but not limited to, AstraZeneca, Bristol-Myers Squibb, GlaxoSmithKline, Johnson & Johnson, Moderna, and Pfizer—and the Company provides these channel partners with various manufacturing services. Among other services, Catalent fills syringes with the channel partners' vaccines, which syringes later get packaged and shipped to the channel partners. The channel partners are thereafter responsible for distributing these products to healthcare providers.

5.      The agreements Catalent enters into with its channel partners are structured to be long-term, so that the channel partners continuously provide the Company with inventory. In accordance with Generally Accepted Accounting Principles ("GAAP"), the Company must recognize revenue on these long-term agreements once it meets certain objective milestones. However, the Company recognizes a substantial amount of this revenue *prior to* billing its customers, thereby reducing third-party transparency and making these long-term agreements highly vulnerable to accounting fraud effectuated through recognizing revenue prematurely.

6.      Between April 2018 and March 2020, the Company's quarterly revenue averaged $669 million, with its stock price averaging at a closing price of $47.57 per share during this period. Thereafter, beginning in March 2020, Catalent experienced massive growth due to business opportunities presented to the Company as a result of the COVID-19 pandemic.

7.     In March 2020, Catalent began receiving opportunities to work on more than 100 COVID-related products from more than sixty clients, including filling COVID vaccines into syringes for Moderna and AstraZeneca, two of the Company's channel partners. Due to increasing demand for the Company's services, Catalent began expanding its facilities. At the same time, Defendants boasted of Catalent's ability to gauge customer demand, providing the market with very strong revenue guidance.

8.     As a result of Catalent's COVID-related projects, the Company's revenues soared to record highs, averaging at $940 million between April 2020 and March 2021, which, notably, represented a ***40% increase from pre-COVID revenues***. Similarly, during this time, the Company's stock was closing at an average price of $102.42 per share.

9.     As a result of the quick expansion in the Company's production activity, several of Catalent's facilities began experiencing significant issues. To keep up with its unrealistic growth targets, the Company began cutting corners on safety and control procedures at its key production facilities.

10.     Catalent largely produces its products out of the Company's two key production facilities: (a) a plant in Bloomington, Indiana, which offers drug product filling and finishing services (the "Bloomington Facility"); and (b) a syringe filling facility in Brussels, Belgium (the "Brussels Facility"). The Company's facilities must follow Current Good Manufacturing Practices ("CGMP"), which are quality and safety control regulations that are enforced by the United States Food and Drug Administration ("FDA"). If a company specializing in pharmaceuticals fails to follow CGMP, it risks intense FDA scrutiny and being issued one or more Form 483s.

11.     Form 483s are issued by the FDA to firm management when the FDA has

finished an inspection of a facility and found conditions that may constitute statutory violations, including CGMP violations. CGMP violations include, but are not limited to, conditions or practices indicating that any drug or device has been adulterated or is being prepared, packed, or held under conditions whereby it may become adulterated or, similarly, rendered injurious to health. Throughout the Relevant Period, as a result of its faulty control procedures and unsafe facility conditions, the Company received at least three Form 483s from the FDA.

12.     On October 26, 2021, based on the results of its inspection of the Brussels Facility, the FDA issued a Form 483 to the Company, informing Catalent that the agency had noticed numerous infractions, including faulty air filtration systems, alarming bacteria growth, and subpar equipment maintenance. Similarly, on September 1, 2022, based on the results of its inspection of the Bloomington Facility, the FDA issued a second Form 483 to the Company, informing Catalent that the agency had noticed numerous infractions, including discovering foreign matter, particular matter, and foreign objects and pieces in vials produced at the Bloomington Facility, in addition to issues with control procedures. Later, on August 19, 2022, the FDA issued a third Form 483 to the Company, this time detailing problems with air filters and other equipment-related issues at the Brussels Facility (collectively, the "Facility Misconduct").

13.      Despite knowing about these pervasive issues with Catalent's production facilities, throughout the Relevant Period, the Individual Defendants concealed this reality from investors, instead making a series of false and misleading statements touting, among other things, Catalent's "*rigorous quality and operational standards*."

14.     Worsening matters, demand for the Company's COVID-19 products began to decrease by mid-2021, with a significant number of potential patients already having received

COVID-19 vaccinations by this point. Despite this decrease in demand, throughout the Relevant Period, Defendants continued to tout growing revenues and strong customer demand for Catalent's products and services. Notably, during the Relevant Period, the Company was reporting average quarterly revenue of $1.2 billion, which represented an ***80% increase over the Company's pre-COVID-19 revenues*** and a 28% increase over its reported revenues for the first year of the pandemic. Company investors were unaware that Defendants had artificially inflated these revenues by way of undertaking fraudulent accounting and channel stuffing schemes. These schemes were intended to make investors believe the Company was stronger and more profitable than it truly was. On September 9, 2021, as a result of Defendants' fraud, Catalent stock traded at a record high of $142.64 per share. Similarly, throughout the Relevant Period, the Company's stock was trading at an average price of $108.00 per share.

15.     The truth began to emerge on August 29, 2022 when Catalent disclosed its financial results for Fiscal Year 2022 (defined below). That day, Catalent revealed that, contrary to the representations Defendants had repeatedly made throughout the Relevant Period, demand for the Company's COVID-related products and services had drastically declined, resulting in Catalent reporting sales that fell below consensus expectations for Fiscal Year 2022.

16.     On this news, the Company's stock price fell $7.42 per share, or 7.4%, from a closing price of $99.70 per share on August 28, 2022, to close at $92.28 per share on August 29, 2022.

17.     Still, Defendants continued to issue false and misleading statements regarding the demand for Catalent's products, the quality control at the Company's facilities, and Catalent's total revenue and earnings.

18.     On September 20, 2022, after the close of trading, the truth continued to emerge

when *The Washington Post* published an article titled "FDA releasing millions of Moderna boosters as states warn of shortages." The article revealed that, as a result of the FDA's inspection of the Bloomington Facility, the FDA was delaying the release of millions of COVID-19 vaccine booster shots previously filled by the Company. The article further revealed that FDA agents had expressed concern that vaccine vials packaged at the Bloomington Facility may have been contaminated as a result of the facility not being sufficiently sterile.

19.     On this news, the Company's stock price fell $8.09 over the following two trading periods, or 9.3%, from a closing price of $87.15 per share on September 20, 2022, to close at $79.06 per share on September 22, 2022.

20.     The truth fully emerged on November 1, 2022 when the Company reported its financial results for the quarterly period ended September 30, 2022 ("Q1 2023"). That day, the Company announced that, for Q1 2023, Catalent's **earnings had fallen to zero**, and the Company was therefore lowering its guidance for fiscal year 2023 from a range of $4.975 billion to $5.225 billion, to a new range of $4.625 billion to $4.875 billion. This news fully revealed to investors for the first time that demand for the Company's products and services was much weaker than the Defendants had continuously touted throughout the Relevant Period.

21.     On this news, the Company's stock price declined by $20.83, or **31.7% over two trading sessions**, from a closing price of $65.73 per share on October 31, 2022, to close at $44.90 per share on November 2, 2022.

22.     In the following weeks, the Company's stock price continued to plummet. On November 16, 2022, the Company informed investors that it had approximately $400 million that it was carrying in excess inventory, further illustrating that Defendants had misrepresented the demand for Catalent's products and the Company's ability to gauge future customer demand

throughout the Relevant Period.

23.     On this news, the Company's stock declined by $6.84 over two trading periods, from a closing price of $48.91 on November 15, 2022, to close at $42.07 per share on November 17, 2022.

24.     Later, on December 8, 2022, GlassHouse Research issued a report which alleged that the Company had been violating GAAP by materially overstating its revenues by $568.2 million. GlassHouse Research's report further revealed a series of red flags at the Company— including the rapid increase in the Company's contract asset and inventory balances, declining customer deposits, executive turnover, and regulators' recent scrutiny of Catalent's revenue accounting—which indicated that the Company was engaging in improper accounting practices. In addition, the report noted that the Company's direct customers were stuffed with excess inventory which "will take years to unwind."

25.     On this news, the Company's stock price declined by $1.68, or 3.6%, from a closing price of $47.22 per share on December 7, 2022, to close at $45.54 per share on December 8, 2022.

26.     In the following months and up to the present, the Company has failed to remediate the plethora of issues at its production facilities, resulting in further scrutiny from the FDA and harm to the Company's reputation. Indeed, between May 4, 2023 and May 12, 2023, the FDA inspected the Company's Bloomington Facility and issued the Company another Form 483, this time for numerous infractions at the Bloomington Facility, including, among other things, missed sanitization procedures, equipment issues, and inadequate maintenance.[1]

27.     The Facility Misconduct has also caused significant harm to the Company's

---

[1]     https://www.fiercepharma.com/manufacturing/catalents-indiana-site-linked-regenerons-high-dose-eylea-rejection-dinged-three

channel partners. Indeed, on June 23, 2023, Bloomberg reported that the FDA had rejected the drug application of Regeneron Pharmaceuticals Inc., one of the Company's channel partners, for a stronger formulation of its best-selling eye medicine "solely due to an ongoing review of inspection findings at [the Bloomington Facility.]"[2]

28.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (i) by prematurely recognizing revenue in violation of U.S. GAAP, the Company materially overstated its revenue and earnings; (ii) the Company had material weaknesses in its internal control over financial reporting, particularly as it pertained to revenue recognition; (iii) the Company falsely represented demand for its products while it knowingly sold more product to its direct customers than could be sold to healthcare providers and end customers; and (iv) the Company violated regulatory rules at key production facilities as a way to rapidly produce excess inventory, which was later used to inflate the Company's financial results through premature revenue recognition in violation of GAAP and/or stuffing its direct customers with this excess inventory. As a result, the Company's public statements were materially false and misleading at all relevant times.

29.     The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact, while, during the Relevant Period, four of the Individual Defendants sold Company shares at inflated prices.

---

[2]   https://www.bloomberg.com/news/articles/2023-06-28/catalent-ctlt-linked-to-regeneron-regn-eye-drug-delay-in-latest-misstep

30.     Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls. The Individual Defendants also breached their fiduciary duties by engaging in and/or causing the Company to engage in the Facility Misconduct.

31.     In light of the Individual Defendants' misconduct—which has subjected the Company, its Chief Executive Officer ("CEO"), its former CEO, and its former Chief Financial Officer ("CFO") to a federal securities fraud class action lawsuit pending in the United States District Court for the District of New Jersey (the "Securities Class Action") and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

32.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

33.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action, of the CEO's, former CEO's, and former CFO's liability in the Securities Class Action, and of their not being disinterested and/or independent directors, a majority of the Company's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

34.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Section 10(b) of the Exchange Act (15. U.S.C. § 78j(b)), and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

35.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

36.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

37.      Venue is proper in this District because the alleged misstatements and wrongs complained of herein entered this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

38.     Plaintiff is a current shareholder of Catalent. Plaintiff has continuously held Catalent common stock since October 15, 2021.

### Nominal Defendant Catalent

39.     Catalent is a Delaware corporation with its principal executive offices at 14 Schoolhouse Road, Somerset, New Jersey 08873. Catalent's shares trade on the New York Stock Exchange ("NYSE") under the ticker symbol "CTLT."

### Defendant Chiminski

40.     Defendant Chiminski served as a Company director from 2009 until he retired on June 30, 2023. Prior to his retirement, Defendant Chiminski served as CEO of the Company from 2009 to July 2022 and as Executive Chair of the Board from 2016 until June 2023. He also served as a member of the Mergers & Acquisitions Committee. According to the proxy statement the Company filed with the SEC on September 16, 2022 (the "2022 Proxy Statement"), as of September 6, 2022, Defendant Chiminski beneficially owned 332,217 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on September 6, 2022 was $88.97 per share, Defendant Chiminski owned approximately $29.5 million worth of Catalent stock.

41.     For the fiscal year ended June 30, 2022 (the "2022 Fiscal Year"), Defendant Chiminski received $12,407,517 in total compensation from the Company. This included $1,075,000 in salary, $6,510,335 in stock awards, $2,790,005 in option awards, $1,890,810 in non-equity incentive plan compensation, and $141,367 in all other compensation.

42.     During the Relevant Period, while the Company's stock price was artificially inflated and before the schemes were exposed, Defendant Chiminski made the following sales of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| July 26, 2022 | 9,691 | $106.90 | $1,035,967 |
| August 25, 2022 | 38,934 | $103.04 | $4,011,759 |

Thus, in total, before the fraud was exposed, he sold 48,625 shares of Company stock on inside information, for which he received approximately $5 million in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the schemes.

43.     The 2022 Proxy Statement stated the following about Defendant Chiminski:

John Chiminski was appointed Catalent's Executive Chair in July 2022. Prior to that he had served as Catalent's Chief Executive Officer since 2009. He joined Catalent after more than 20 years of experience at GE Healthcare in engineering, operations, and senior leadership roles. From 2007 to 2009, Mr. Chiminski was President and Chief Executive Officer of GE Medical Diagnostics, a global business with sales of $1.9 billion. From 2005 to 2007, he served as Vice President and General Manager of GE Healthcare's Global Magnetic Resonance Business, and from 2001 to 2005, as Vice President and General Manager of Global Healthcare Services. Earlier at GE, he held a series of cross-functional leadership positions in both manufacturing and engineering, including a GE Medical Systems assignment in France. Mr. Chiminski has served as a director of Berkeley Lights since May 2021. Mr. Chiminski holds a BS from Michigan State University and an M.S. from Purdue University, both in electrical engineering, as well as a Master's Degree in Management from the Kellogg School of Management at Northwestern University.

**Defendant Maselli**

44.     Defendant Maselli has served as the Company's President and CEO and as a Company director since July 2022. According to the 2022 Proxy Statement, as of September 6, 2022, Defendant Maselli beneficially owned 79,000 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on September 6, 2022 was $88.97 per share, Defendant Maselli owned approximately $7.1 million worth of Catalent stock.

45.     For the 2022 Fiscal Year, Defendant Maselli received $3,234,030 in total compensation from the Company. This included $654,183 in salary, $1,190,169 in stock awards, $510,008 in option awards, $733,000 in non-equity incentive plan compensation, and $146,670 in all other compensation.

46.     During the Relevant Period, while the Company's stock price was artificially inflated and before the schemes were exposed, Defendant Maselli made the following sales of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| July 26, 2022 | 816 | $106.90 | $87,230 |

| August 25, 2022 | 4,646 | $103.04 | $478,723 |
|---|---|---|---|

Thus, in total, before the fraud was exposed, he sold 5,462 shares of Company stock on inside information, for which he received approximately $565,953 in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the schemes.

47.     The 2022 Proxy Statement stated the following about Defendant Maselli:

Alessandro Maselli was appointed Catalent's President and Chief Executive Officer and joined the Board of Directors in July 2022. He previously served as the company's President & Chief Operating Officer since February 2019. Mr. Maselli joined Catalent in 2010 as Director of Operations at Catalent's pharmaceutical, nutritional and cosmetics plant in Aprilia, Italy. In 2013, he was appointed General Manager of Zydis® operations at Catalent's facility in Swindon, U.K., in 2015 he became Vice President of Operations, Europe, for Catalent's Drug Delivery Solutions business unit, and in 2016 he was named Catalent's Senior Vice President, Global Operations. Prior to Catalent, Mr. Maselli held operational and business leadership roles at Alstom and SGS. From 1998 to 2006, he held roles of increasing responsibility from process engineer to operations director at ABB. Mr. Maselli began his career as an automation systems engineer in the food industry. A native of Italy, Mr. Maselli earned bachelor and master degrees in electronic engineering from La Sapienza University of Rome.

**Defendant Castellano**

48.     Defendant Castellano served as the Company's Senior Vice President and CFO from June 2021 until he stepped down from these positions in April 2023. According to the 2022 Proxy Statement, as of September 6, 2022, Defendant Castellano beneficially owned 19,364 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on September 6, 2022 was $88.97 per share, Defendant Castellano owned approximately $1.7 million worth of Catalent stock.

49.     For the 2022 Fiscal Year, Defendant Castellano received $1,671,067 in total compensation from the Company. This included $500,000 in salary, $420,150 in stock awards, $180,016 in option awards, $548,240 in non-equity incentive plan compensation, and $22,661 in

all other compensation.

50.     During the Relevant Period, while the Company's stock price was artificially inflated and before the schemes were exposed, Defendant Castellano made the following sales of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| July 26, 2022 | 347 | $106.90 | $37,094 |
| August 25, 2022 | 1,414 | $103.04 | $145,698 |

Thus, in total, before the fraud was exposed, he sold 1,761 shares of Company stock on inside information, for which he received approximately $182,792 in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the schemes.

51.     The 2022 Proxy Statement stated the following about Defendant Castellano:

Thomas Castellano was named Senior Vice President & Chief Financial Officer in June 2021. Mr. Castellano previously served as Catalent's Global Vice President of Operational Finance, providing finance partnership on strategic execution across the company's business units, and as a member of Catalent's Executive Leadership Team. He joined the company as Director for Financial Planning & Analysis in 2008, playing an integral role in Catalent's successful initial public offering in 2014, and has served in successively senior positions since then, including as Vice President, Financial Planning & Analysis and Vice President, Finance, Investor Relations, and Treasurer. Prior to joining the company, he worked with the capital markets finance group at Lehman Brothers, holding roles of increasing responsibility. Tom began his career at Cendant Corporation as part of its financial leadership development program. He holds a bachelor's degree in finance and an MBA, both from Seton Hall University.

**Defendant Balachandran**

52.     Defendant Balachandran has served as a Company director since May 2017. He also serves as a member of the Nominating and Corporate Governance Committee and the Quality and Regulatory Compliance Committee. According to the 2022 Proxy Statement, as of September 6, 2022, Defendant Balachandran beneficially owned 15,514 shares of the Company's

common stock. Given that the price per share of the Company's common stock at the close of trading on September 6, 2022 was $88.97 per share, Defendant Balachandran owned approximately $1.4 million worth of Catalent stock.

53.     For the 2022 Fiscal Year, Defendant Balachandran received $289,971 in total compensation from the Company. This included $100,000 in fees earned or paid in cash and $189,971 in stock awards.

54.     The 2022 Proxy Statement stated the following about Defendant Balachandran:

Madhu Balachandran has been a board member since May, 2017. Mr. Balachandran was Chief Operating Officer of Nutcracker Therapeutics, a developer of mRNA therapeutics, from September 2020 until March 2022. He previously served as the Chief Executive Officer of ADRx Inc., a preclinical stage biotechnology company, from August 2019 until October 2020. Prior to that he was Executive Vice President, Operations of Amgen Inc., a global biotechnology company, from August 2012 until July 2016 and retired as an Executive Vice President in January 2017. Mr. Balachandran joined Amgen in 1997 as Associate Director, Engineering. He became Director, Engineering in 1998, and, from 1999 to 2001, he held the position of Senior Director, Engineering and Operations Services before moving to the position of Vice President, Information Systems from 2001 to 2002. Thereafter, Mr. Balachandran was Vice President, Puerto Rico Operations from May 2002 to February 2007. From February 2007 to October 2007, Mr. Balachandran was Vice President, Site Operations, and, from October 2007 to August 2012, he held the position of Senior Vice President, Manufacturing. Prior to his tenure at Amgen, Mr. Balachandran held leadership positions at Copley Pharmaceuticals, now a part of Teva Pharmaceuticals Industries Ltd., and Burroughs Welcome Company, a predecessor through mergers of GlaxoSmithKline plc. He has served as a director of A2 Biotherapeutics since September 2019, as a director of Stevanato Group since September 2018, and as a director of uniQure NV since September 2017. He is on the Audit Committee at A2, on the Compensation Committee at uniQure, and on the Remuneration, Strategy, and Nominating and Governance Committees at Stevanato Group. Mr. Balachandran holds a Master of Science degree in Chemical Engineering from The State University of New York at Buffalo and an MBA from East Carolina University.

**Defendant Barber**

55.     Defendant Barber has served as a Company director since April 2021. He also serves as a member of the Compensation Committee and the Quality and Regulatory Compliance

Committee. According to the 2022 Proxy Statement, as of September 6, 2022, Defendant Barber beneficially owned 2,247 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on September 6, 2022 was $88.97 per share, Defendant Barber owned approximately $199,916 worth of Catalent stock.

56.     For the 2022 Fiscal Year, Defendant Barber received $289,971 in total compensation from the Company. This included $100,000 in fees earned or paid in cash and $189,971 in stock awards.

57.     The 2022 Proxy Statement stated the following about Defendant Barber:

Michael J. Barber has been a board member since April 2021. He retired as the Chief Diversity Officer for General Electric Company in January 2022. During his forty-year career at GE, Mr. Barber held a variety of progressively senior roles in engineering, operations, and product management, including service as President and CEO of GE Molecular Imaging and Computed Tomography from 2016 until 2020; as Chief Engineer, GE Healthcare and Chief Operating Officer, GE Healthcare Systems from 2013 until 2015; as VP and General Manager, Molecular Imaging, GE Healthcare in 2012; as Vice President, healthymagination (GE Corporate) from 2009 until 2011; and as Vice President and CTO, GE Healthcare from 2007 until 2008. Among other prestigious awards, he was named a "Master of Innovation" by Black Enterprise in 2009 and elected a Fellow of the American Institute of Medical and Biological Engineering in 2014. He served as a director of Talix, Inc. from 2017 until it was acquired by Edifecs in 2021, and served as a director of Healthline, Inc. from 2009 until its acquisition by Summit Partners in 2016. He also served as a board member of the National Action Council for Minorities in Engineering (NACME) from 2009 until 2022. Mr. Barber received a B.S. in electrical engineering and an honorary doctorate in engineering from the Milwaukee School of Engineering, where he also serves as a Regent.

**Defendant Carroll**

58.     Defendant Carroll has served as a Company director since July 2015 and as Executive Chair of the Board since June 2023. He also serves as a member of the Mergers and Acquisitions Committee. According to the 2022 Proxy Statement, as of September 6, 2022, Defendant Carroll beneficially owned 28,037 shares of the Company's common stock. Given

that the price per share of the Company's common stock at the close of trading on September 6, 2022 was $88.97 per share, Defendant Carroll owned approximately $2.5 million worth of Catalent stock.

59.      For the 2022 Fiscal Year, Defendant Carroll received $320,326 in total compensation from the Company. This included $130,275 in fees earned or paid in cash and $189,971 in stock awards.

60.      The 2022 Proxy Statement stated the following about Defendant Carroll:

J. Martin Carroll has been a director since July 2015 and has served as our lead independent director since October 2021. He served as President and Chief Executive Officer of Boehringer Ingelheim Corporation and of Boehringer Pharmaceuticals, Inc. from 2003 until 2011 and as Head, Corporate Strategy and Development of Boehringer Ingelheim GmbH from 2012 until his retirement in 2013. He served as a director of Boehringer Ingelheim Corporation from 2003 until December 2012. Mr. Carroll joined the Boehringer Ingelheim organization in 2002 as President of Boehringer Pharmaceuticals, Inc. Mr. Carroll worked at Merck & Company, Inc. from 1976 to 2001. From 1972 to 1976, he served in the United States Air Force where he attained the rank of Captain. Mr. Carroll has been chairperson of the board of directors of Esperion Therapeutics since June 2022. He served as a director of Durata Therapeutics, Inc. from August 2014 until November 2014 when it was acquired by Actavis, as a director of Vivus, Inc. from May 2013 until September 2014, as a director of Therapeutics MD from March 2015 until December 2021, and as a director of Mallinckrodt plc from June 2013 until May 2022. He also served as a director of Inotek from April 2016 to June 2016 and as Chairman of its Board from June 2016 until January 2018 when Inotek was sold to Rocket Pharmaceutical. Mr. Carroll received a B.A. in accounting and economics from the College of the Holy Cross and an M.B.A. from Babson College.

**Defendant Classon**

61.      Defendant Classon has served as a Company director since August 2014. He also serves as a member of the Audit Committee and Compensation Committee. According to the 2022 Proxy Statement, as of September 6, 2022, Defendant Classon beneficially owned 32,179 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on September 6, 2022 was $88.97 per share, Defendant

Classon owned approximately $2.9 million worth of Catalent stock.

62.     For the 2022 Fiscal Year, Defendant Classon received $299,971 in total compensation from the Company. This included $110,000 in fees earned or paid in cash and $189,971 in stock awards.

63.     The 2022 Proxy Statement stated the following about Defendant Classon:

Rolf Classon has been a board member since August 2014. From October 2002 until his retirement in July 2004, Mr. Classon was Chairman of the Executive Committee of Bayer HealthCare AG, a subsidiary of Bayer AG. He served as President of Bayer Diagnostics from 1995 to 2002 and as Executive Vice President of Bayer Diagnostics from 1991 to 1995. Prior to 1991, Mr. Classon held various management positions with Pharmacia Corporation. Mr. Classon currently serves as Vice Chairman of the Supervisory Board of Fresenius Medical Care AG & Co. KGaA. He was previously Chairman of the Board of Directors of Perrigo Company plc from 2018 to 2022, having joined that board as a director in 2017, and Chairman of the Board of Directors of Tecan Group Ltd., serving from 2009 until April 2018. Mr. Classon served as Chairman of the Board of Directors of Hill-Rom Corporation from 2006 until March 2018, also serving as Vice Chairman of the Board from 2003 through May 2005 and as interim chief executive officer from May 2005 until March 2006. From 2005 to 2015, Mr. Classon served as Chairman of the Board of Directors of Auxilium Pharmaceuticals, Inc., and as Vice Chairman from March 2005 to April 2005. He also previously served as a director of Sequanna Medical AG from 2016 to 2017; of Aerocrine AB, Stockholm from 2013 to 2015; of Millipore Corporation from 2005 to 2010; of Prometheus Laboratories Inc. from 2004 to 2010; and of Enzon Pharmaceuticals Inc. from 1997 to 2011. Mr. Classon received his Chemical Engineering Certificate from the Gothenburg School of Engineering and a Business Degree from the Gothenburg University. Mr. Classon was granted a waiver, which will end at our 2023 Annual Meeting of Shareholders, from the resignation obligation imposed by our Corporate Governance Guidelines on directors over the age of 75.

**Defendant Crane**

64.     Defendant Crane has served as a Company director since February 2018. She also serves as a member of the Audit Committee and the Nominating and Corporate Governance Committee. According to the 2022 Proxy Statement, as of September 6, 2022, Defendant Crane beneficially owned 12,731 shares of the Company's common stock. Given that the price per

share of the Company's common stock at the close of trading on September 6, 2022 was $88.97 per share, Defendant Crane owned approximately $1.1 million worth of Catalent stock.

65.     For the 2022 Fiscal Year, Defendant Crane received $299,971 in total compensation from the Company. This included $110,000 in fees earned or paid in cash and $189,971 in stock awards.

66.     The 2022 Proxy Statement stated the following about Defendant Crane:

Rosemary Crane has been a board member since February 2018. Ms. Crane is currently a member of the boards of Teva Pharmaceutical Industries Limited, where she serves as chair of the Human Resources Compensation Committee; of Tarsus Pharmaceuticals, where she serves as chair of the Science and Technology Committee; of Certara, Inc.; and of Hackensack Meridian Health Center for Discovery and Innovation. She previously served as a director of Edge Therapeutics, Inc., Unilife Corporation, Cipher Pharmaceuticals, MELA Sciences, Inc., Epocrates Inc., Targanta Therapeutics, and Zealand Pharma A/S. Ms. Crane retired in 2014 from MELA Sciences, Inc., where she served as President and Chief Executive Officer beginning in 2013. From 2011 to 2013, she was a Partner and Head of Commercialization at Appletree Partners and, from 2008 to 2011, served as Chief Executive Officer and President of Epocrates Inc. From 2002 to 2008, Ms. Crane served in several senior executive positions at the Johnson & Johnson Group of Companies, ending as Company Group Chairman, OTC and Nutritional Group. From 1982 to 2002, she was at Bristol-Myers Squibb Company, ending her tenure there as President, U.S. Primary Care. Ms. Crane received her M.B.A. from Kent State University and her B.A. in Communications and English from the State University of New York at Oswego.

**Defendant Greisch**

67.     Defendant Greisch has served as a Company director since February 2018. He also serves as Chair of the Audit Committee and as a member of the Compensation Committee. According to the 2022 Proxy Statement, as of September 6, 2022, Defendant Greisch beneficially owned 25,731 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on September 6, 2022 was $88.97 per share, Defendant Greisch owned approximately $2.3 million worth of Catalent stock.

68.     For the 2022 Fiscal Year, Defendant Greisch received $314,971 in total

compensation from the Company. This included $125,000 in fees earned or paid in cash and $189,971 in stock awards.

69.     The 2022 Proxy Statement stated the following about Defendant Greisch:

John Greisch has been a board member since February 2018. Mr. Greisch retired in May 2018 from his position as President and Chief Executive Officer of Hill-Rom Holdings, Inc., a position that he had held since 2010. Prior to that, Mr. Greisch was President International Operations for Baxter International, Inc., a position he held beginning in 2006. During his seven-year tenure with Baxter, he also served as Baxter's Chief Financial Officer and as President of Baxter's BioScience division. Before his time with Baxter, Mr. Greisch was President and Chief Executive Officer for FleetPride Corporation in Deerfield, Illinois, an independent after-market distribution company serving the transportation industry. Prior to his tenure at FleetPride, he held various positions at The Interlake Corporation, including serving as President of its Materials Handling Group. Mr. Greisch currently serves as chairman of the board of Viant Medical LLC and as lead independent director on the board of Carrier Corporation. He previously served on the boards of Cerner Corporation, Idorsia Pharmaceuticals Ltd., Hill-Rom Holdings, Inc., Actelion Ltd, and TomoTherapy, Inc. Additionally, he serves as a senior advisor to TPG Capital and is on the board of directors for Ann & Robert H. Lurie Children's Hospital of Chicago. He received a Masters in Management from the Kellogg School of Management at Northwestern University and a B.S. degree from Miami University.

**Defendant Kreuzburg**

70.     Defendant Kreuzburg has served as a Company director since February 2018. She also serves as Chair of the Nominating and Corporate Governance Committee and as a member of the Quality and Regulatory Compliance Committee. According to the 2022 Proxy Statement, as of September 6, 2022, Defendant Kreuzburg beneficially owned 9,330 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on September 6, 2022 was $88.97 per share, Defendant Kreuzburg owned approximately $830,090 worth of Catalent stock.

71.     For the 2022 Fiscal Year, Defendant Kreuzburg received $289,971 in total compensation from the Company. This included $100,000 in fees earned or paid in cash and

$189,971 in stock awards.

72.     The 2022 Proxy Statement stated the following about Defendant Kreuzburg:

Dr. Christa Kreuzburg has been a board member since February 2018. Dr. Kreuzburg has been consulting in the healthcare sector since retiring from Bayer AG in 2009 after 19 years of service in a variety of roles, including service as Head of the Bayer Schering Pharma Europe/Canada unit of Bayer Healthcare from 2007 to 2008 and as Head of the Pharma Primary Care/International Operations unit of Bayer Healthcare from 2006 to 2007. She also held roles in the Strategic Planning and Central Research groups. Dr. Kreuzburg is currently a member of the board of directors of Tecan Trading AG of Switzerland and has previously served as a director of Freedom Innovations LLC. She received her Ph.D. and Bachelor's degrees in Physical Chemistry from Duisburg University in Germany.

**Defendant Lucier**

73.     Defendant Lucier has served as a Company director since April 2015. He also serves as Chair of the Compensation Committee and as a member of the Mergers and Acquisitions Committee. According to the 2022 Proxy Statement, as of September 6, 2022, Defendant Lucier beneficially owned 21,109 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on September 6, 2022 was $88.97 per share, Defendant Lucier owned approximately $1.9 million worth of Catalent stock.

74.     For the 2022 Fiscal Year, Defendant Lucier received $302,471 in total compensation from the Company. This included $112,500 in fees earned or paid in cash and $189,971 in stock awards.

75.     During the Relevant Period, while the Company's stock price was artificially inflated and before the schemes were exposed, Defendant Lucier made the following sale of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| November 23, 2021 | 5,068 | $127.37 | $645,511 |

Thus, in total, before the fraud was exposed, he sold 5,068 shares of Company stock on inside information, for which he received approximately $645,511 in proceeds. His insider sale, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrates his motive in facilitating and participating in the schemes.

76.     The 2022 Proxy Statement stated the following about Defendant Lucier:

Gregory T. Lucier has been a director since April 2015. Mr. Lucier is the chief executive officer of Corza Health, Inc., a company focused on acquiring companies and assets as part of a strategy to build a market-leading healthcare business. Prior to that, he served as Chief Executive Officer of NuVasive, Inc., a medical device company, from 2015 to 2018. Before joining NuVasive, Mr. Lucier was Chairman and Chief Executive Officer of Life Technologies Corporation (formerly Invitrogen Corporation), a global biotechnology company, from May 2003 until it was acquired by Thermo Fisher Scientific Inc. in February 2014. Prior to that, Mr. Lucier was a corporate officer at General Electric Company, where he served in a variety of leadership roles. Mr. Lucier is chairman of the board of Berkeley Lights and serves as a director of Dentsply Sirona and Maravai LifeSciences. He previously served as a director of Life Technologies Corporation from May 2003 to February 2014, of Carefusion Corporation from August 2009 until its sale to Becton Dickinson in March 2015, of Invuity, Inc. from October 2014 until its sale to Stryker in October 2018, and of Nuvasive from December 2013 to May 2021. Mr. Lucier received an M.B.A. from Harvard Business School and a B.S. in industrial engineering from Pennsylvania State University.

**Defendant Morel**

77.     Defendant Morel has served as a Company director since November 2015. He also serves as Chair of the Quality and Regulatory Compliance Committee. According to the 2022 Proxy Statement, as of September 6, 2022, Defendant Morel beneficially owned 54,313 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on September 6, 2022 was $88.97 per share, Defendant Morel owned approximately $4.8 million worth of Catalent stock.

78.     For the 2022 Fiscal Year, Defendant Morel received $301,638 in total

compensation from the Company. This included $111,667 in fees earned or paid in cash and $189,971 in stock awards.

79.     The 2022 Proxy Statement stated the following about Defendant Morel:

Dr. Donald E. Morel has been a board member since November 2015. Dr. Morel retired in June 2015 as Chairman of West Pharmaceutical Services, Inc., a leading manufacturer of packaging components and delivery systems for injectable drugs and healthcare products, a position he had held since March 2003. He also served as West's Chief Executive Officer from April 2002 until April 2015 and as its President from April 2002 until June 2005. Currently, Dr. Morel serves as Chairman of the Board of Directors of the American Oncologic Hospital of the Fox Chase Cancer Center. He also serves as Chairman of the Board of Trustees of the Franklin Institute, a trustee of the University of Virginia Darden School Foundation, and an Emeritus Trustee of Lafayette College. Additionally, Dr. Morel has been a Director of Stevanato Group since September 2018 and of Integra Life Sciences Holdings Corporation since August 2013. Prior to that, he served as a Director of Kensey Nash Corporation from 2010 until 2012. Dr. Morel obtained a Master of Science degree and a Ph.D. in Materials Science from Cornell University and a Bachelor of Science degree in Engineering from Lafayette College.

**Defendant Stahl**

80.     Defendant Stahl has served as a Company director since August 2014. He also serves as Chair of the Mergers and Acquisitions Committee and as a member of the Audit Committee. According to the 2022 Proxy Statement, as of September 6, 2022, Defendant Stahl beneficially owned 32,179 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on September 6, 2022 was $88.97 per share, Defendant Stahl owned approximately $2.9 million worth of Catalent stock.

81.     For the 2022 Fiscal Year, Defendant Stahl received $318,030 in total compensation from the Company. This included $128,059 in fees earned or paid in cash and $189,971 in stock awards.

82.     The 2022 Proxy Statement stated the following about Defendant Stahl:

Jack Stahl has been a board member since August 2014. Mr. Stahl was the

President and Chief Executive Officer of Revlon Inc. from 2002 until his retirement in 2006. Prior to joining Revlon, Mr. Stahl served as President and Chief Operating Officer of The Coca-Cola Company from 2000 to 2001, having previously served in various management positions at that company since joining it in 1979. Mr. Stahl is the chair of the board of directors of United Natural Food, Inc. and serves on the U.S. board of advisors of CVC Capital. Additionally, he formerly served on the boards of Schering-Plough Corporation, Dr Pepper Snapple Group, Saks, Inc., Coty Inc., Ahold Delhaize, and Advantage Solutions LLC, and was chairman of the board of managers of New Avon LLC. Mr. Stahl holds a bachelor's degree in economics from Emory University and a master's degree from the Wharton School of Business at the University of Pennsylvania.

**Defendant Zippelius**

83.     Defendant Zippelius served as a Company director from May 2019 until he retired in January 2023. According to the 2022 Proxy Statement, as of September 6, 2022, Defendant Zippelius beneficially owned 7,830 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on September 6, 2022 was $88.97 per share, Defendant Zippelius owned approximately $696,635 worth of Catalent stock.

84.     For the 2022 Fiscal Year, Defendant Zippelius received $289,971 in total compensation from the Company. This included $100,000 in fees earned or paid in cash and $189,971 in stock awards.

85.     The 2022 Proxy Statement stated the following about Defendant Zippelius:

Peter Zippelius has been a board member since May 2019. Mr. Zippelius is a partner of Leonard Green & Partners, L.P., which he joined in 2018. Previously, he was a Managing Director and Co-Head of North American Healthcare Investment Banking at J.P. Morgan, which he joined in 2015. Prior to J.P. Morgan, Mr. Zippelius was a Managing Director and Co-Head of Healthcare Services Investment Banking at Deutsche Bank Securities and prior to that he was a Managing Director in the Healthcare Investment Banking group at Morgan Stanley. Mr. Zippelius began his career in the Mergers and Acquisitions department of Solomon Smith Barney. He earned a Bachelor of Science degree in Finance from Virginia Tech.

Mr. Zippelius was nominated by affiliates of Leonard Green & Partners, L.P.

("Leonard Green"), holders of our common stock who are entitled to nominate one director nominee pursuant to a stockholders' agreement they have with us.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

86.     By reason of their positions as officers, directors, and/or fiduciaries of Catalent and because of their ability to control the business and corporate affairs of Catalent, the Individual Defendants owed Catalent and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Catalent in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Catalent and its shareholders so as to benefit all shareholders equally.

87.     Each director and officer of the Company owes to Catalent and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

88.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Catalent, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

89.     To discharge their duties, the officers and directors of Catalent were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

90.     Each Individual Defendant, by virtue of their position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their

26

obligations as directors and officers of Catalent, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised a majority of Catalent's Board at all relevant times.

91.     As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

92.     To discharge their duties, the officers and directors of Catalent were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Catalent were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, New Jersey, and the United States, and

pursuant to Catalent's own Standards of Business Conduct (the "Code of Conduct");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Catalent conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Catalent and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Catalent's operations would comply with all applicable laws and Catalent's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth

above.

93.     Each of the Individual Defendants further owed to Catalent and the shareholders the duty of loyalty requiring that each favor Catalent's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

94.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Catalent and were at all times acting within the course and scope of such agency.

95.     Because of their advisory, executive, managerial, directorial, and controlling positions with Catalent, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

96.      The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Catalent.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

97.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

98.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act;

(ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

99.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Catalent was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

100.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

101.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Catalent and was at all times acting within the course and scope of such agency.

## CATALENT'S CODE OF COUNDUCT

102.    Catalent's Code of Conduct opens by stating that the Code "forms the foundation that allows [the Company] to work responsibly and with integrity" and "applies to all employees,

officers, and directors, and is fully authorized and supported by Catalent's executive team."

103.    Regarding "Ethical Decision-Making," the Code of Conduct states the following,

in relevant part:

> It is important that we adhere to both the spirit and the letter of these standards. To ensure we always act responsibly and in the best interest of the company, we should examine each situation and consider the following: • Am I acting responsibly and with integrity? • Would my decision be viewed positively by co-workers, the community, and the government? • Would I be comfortable if my decision were on the front page of a newspaper? • Would my decision ensure compliance with our code, Catalent policies, and applicable laws?

> If you cannot answer "yes" to all of these questions, talk to your manager or consult the other resources listed at the back of this booklet. Catalent encourages all of us to internally raise questions and concerns to the appropriate personnel.

104.    Regarding "Integrity," the Code of Conduct states the following, in relevant part:

> We are committed to strict compliance with our code and all applicable laws, regulations, and standards that apply to our business activities around the world. By understanding and following our code, Catalent policies, and applicable laws, and by seeking guidance when the best decision is not clear, you make Catalent a place where employees want to work, customers and suppliers want to do business, and investors want to place their confidence and trust.

105.    Regarding "Restrictions on Buying & Selling Securities," the Code of Conduct

states the following, in relevant part:

> While employed with Catalent, you may become aware of information that has not been released to the public and may be material to an investor's decision to buy or sell the securities of Catalent or another company with whom Catalent has an investment or customer relationship. Any information that could reasonably be expected to affect the price of the security (e.g., earnings information; acquisitions or divestitures; significant new contracts; the gain or loss of a major customer or vendor; or important information on litigation or regulatory actions) is potentially material.

> It is a violation of Catalent policy to trade in the securities of any company while in possession of material nonpublic information about that company. Engaging in any such activities is commonly referred to as "insider trading." Likewise, you may not disclose such information to anyone else (including, but not limited to, relatives, friends, colleagues, or stockbrokers) until the information has been released publicly and the public has had time to react.

106.     Regarding "Conflicts of Interest," the Code of Conduct states the following, in

relevant part:

> To make business decisions with integrity and honesty, employees, directors,
> officers, suppliers, agents, or any other representatives of Catalent must avoid
> engaging in conduct or activities that create or appear to create a conflict of
> interest. A "conflict of interest" arises when your personal, social, financial, or
> political activities make it difficult for you to perform your work for Catalent
> objectively and effectively. We must always avoid actual conflicts, but even the
> appearance of a conflict of interest can be harmful and should also be avoided.
>
> With that in mind, employees may not: • Take personally for themselves
> opportunities that were discovered through the use of company property or
> information or their position with the company. • Use company property,
> information, or their position for personal gain. • Compete with Catalent. • Serve
> on the governing body of a customer or supplier.
>
> As with many issues, the best way to avoid a conflict of interest is to ask
> questions and address any situation that may have the potential to be
> misinterpreted by others, including other employees, customers, regulators,
> suppliers, investors, and the public.

107.     The Code of Conduct section on "Accounting, Auditing, Internal Controls &

Financial Reporting" states the following, in relevant part:

> Catalent is committed to maintaining compliance with all applicable securities
> laws and regulations, accounting standards, accounting controls, and audit
> practices. You may submit verbal or written concerns or reports of possible
> violations regarding accounting, auditing, internal controls, or financial reporting
> through the Business Conduct Helpline, which has special procedures for
> handling such concerns.

108.     In a section titled "Ask Questions & Seek Guidance," the Code of Conduct states

the following, in relevant part:

> Your primary resource for work-related issues and guidance is your manager. If
> you have a concern about a legal or business conduct issue, or if you receive
> information or have reason to believe that a violation of our code, Catalent policy,
> or the law has occurred, the most important things you can do are ask questions,
> seek guidance, or raise the concern.

109.     In violation of the Code of Conduct, the Individual Defendants conducted little,

if any, oversight of the Company's engagement in the Individual Defendants' schemes to participate in the Facility Misconduct and issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, violations of the Exchange Act, and aiding and abetting thereof. Moreover, four of the Individual Defendants violated the Code of Conduct by engaging in insider trading. Also in violation of the Code of Conduct, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.

## CATALENT'S AUDIT COMMITTEE CHARTER

110.    The Company also maintains an Audit Committee Charter (the "Charter"). According to the Charter, the purpose of the Audit Committee is to, *inter alia*:

A.  Provid[e] assistance with respect to the Board of Directors' oversight of:

   (i) The quality and integrity of the Company's financial statements;
   (ii) The Company's compliance with legal and regulatory requirements;
   (iii) The independent registered public accounting firm's qualifications, performance and independence; and
   (iv) The performance of the Company's internal audit function.

B.  Prepar[e] the audit committee report required by the Securities and Exchange Commission (the "SEC") to be included in the Company's annual proxy statement.

111.    In a section titled "Documents/Reports Review," the Charter provides that the Audit Committee shall:

1. Review and discuss with management and the independent registered public accounting firm prior to public dissemination the Company's annual audited financial statements and quarterly financial statements, including the Company's specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

2. Discuss with the independent registered public accounting firm the matters required to be discussed by the applicable auditing standards adopted by the PCAOB and approved by the SEC from time to time.

3. Review and discuss with management and the independent registered public accounting firm the Company's earnings press releases (paying particular attention to the use of any "pro forma" or "adjusted" non-GAAP information and measures), as well as financial information and earnings guidance provided to analysts and rating agencies. The Committee's discussion in this regard may be general in nature (i.e., discussion of the types of information to be disclosed and the type of presentation to be made) and need not take place in advance of each earnings release or each instance in which the Company may provide earnings guidance.

4. Review and discuss with management and the independent registered public accounting firm any major issues arising as to the adequacy and effectiveness of the Company's internal controls, any actions taken in light of material control deficiencies and the adequacy of disclosures about changes in internal control over financial reporting.

112.    In a section titled "Legal Compliance/General," the Charter provides that the Audit Committee shall, among other things:

17. Periodically review and discuss with the Company's General Counsel any legal matters that have been brought to the Committee's attention and that could have a significant impact on the Company's financial statements.

18. Review and discuss with management and the independent registered public accounting firm the Company's guidelines and policies with respect to risk assessment and risk management.   The Committee should discuss the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures.

113.    In violation of the Charter, Defendants Classon, Crane, Stahl, and Greisch failed to adequately review and discuss the Company's quarterly earnings press releases; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of Conduct.

## CATALENT'S QUALITY AND REGULATORY COMPLIANCE COMMITTEE CHARTER

114.   The Company also maintains a Quality and Regulatory Compliance Committee Charter (the "Quality Charter"), which requires that the Quality and Regulatory Committee, among other things, assist the Board by:

A. Reviewing and overseeing the personnel, activities, processes and procedures by which the Company assures the quality of the products and services it delivers;

B. Reviewing and overseeing the Company's compliance with relevant laws, regulations and internal procedures governing the quality of the products and services the Company delivers;

C. Providing guidance on the inspiration and maintenance of a culture of compliance; and

D. Reporting on significant audits and inspections, and performing follow-up oversight of corrective and preventive actions ("CAPAs")

115.   According to the Quality Charter, the Quality and Regulatory Committee's responsibilities regarding quality assurance include "review[ing] and oversee[ing] the activities, processes, and procedures by which the Company assures the quality of the products and services it delivers, as well as oversee[ing] any related personnel policy or matter that may affect quality and regulatory compliance, all in comparison to industry best practices."

116.   The Quality and Regulatory Committee is also responsible for reviewing "the status of the Company's compliance with laws, regulations, and internal procedures relating to quality, safety, efficacy, or handling with regard to the Company's products and related services and their consistency with industry best practices." The Quality Charter states the following, in relevant part:

[The Quality and Regulatory Committee must] [r]eview the status of the Company's compliance with laws, regulations, and internal procedures relating to quality, safety, efficacy, or handling with regard to the Company's products and related services and their consistency with industry best practices (e.g., compliance with the U.S. federal Food, Drug and Cosmetics Act, as amended, all related U.S. Food and Drug Administration ("FDA") requirements, and the

comparable laws and regulations of states, localities, and foreign countries in which the Company operates or in which its products or services are used, including laws and regulations relating to current good manufacturing practices ("cGMP"), current good laboratory practices ("cGLP"), and current good distribution practices ("cGDP"), as applicable; compliance with other U.S. and ex-U.S. laws and regulations relating to the manufacture, handling, distribution, sale, or use of pharmaceutical and consumer health products, and related services; and compliance with the laws and regulations relating to claims as to the safety, efficacy, or superiority of such products).

117.    Regarding the Company's regulatory and compliance practices, the Quality

Charter also states the following, in relevant part:

[The Quality and Regulatory Committee must] [r]eview and evaluate internal reports and external data, based on criteria to be developed by the Committee, to assess whether there is any significant concern regarding the Company's regulatory and/or compliance practices, including:

a. Receive details and factual reports on relevant governmental investigations, including the conduct at issue and whether it reflects a regulatory or compliance issue at the Company.

b. Receive relevant qui tam lawsuits unsealed by the government and/or made known to the Company relating to quality or regulatory compliance, and receive an analysis of the factual allegations of the claims, a review of any potential legal exposure the claims present for the Company, and whether the claims reflect a regulatory or compliance issue for the Company.

c. Receive all material FDA Form 483 reports and warning letters (and comparable notifications from other agencies) and the responses to such, as well as reports on the steps taken to implement the responses and an evaluation of whether the reports or letters, together with the Company's responses, raise any product-related regulatory and compliance issue.

d. Receive, in its discretion, reports from management on internal messaging to employees regarding the Company's commitment to behavior and practices that assure quality and compliance with related legal standards, as well as the Company's efforts to promote a culture of compliance.

e. Receive reports from management with respect to any significant disciplinary action against any of the Company's quality and regulatory personnel or internal audit personnel, including the nature of the conduct that led to the disciplinary action, the disciplinary action and the reason for it, and an analysis of whether the underlying conduct reflects any compliance or regulatory concern or issue.

118.    In violation of the Quality Charter, Defendants Balachandran, Barber, Kreuzburg, and Morel failed to adequately review and oversee the activities, processes, and procedures by which the Company assures the quality of the products and services it delivers; review the status of the Company's compliance with laws, regulations, and internal procedures relating to quality, safety, efficacy, or handling with regard to the Company's products and related services and their consistency with industry best practices; and review and evaluate internal reports and external data to assess whether there is any significant concern regarding the Company's regulatory and/or compliance practices.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

**Background**
*Catalent's Business and Long-Term Agreements with Channel Partners*

119.    Catalent is a global provider of delivery technologies, development, drug manufacturing, biologics, gene therapies and consumer health products. The Company operates over fifty facilities worldwide and provides various services to clients which involve delivery technologies for drugs, including pre-filled syringes and vials.

120.    The Company operates its business under two segments: (1) Biologics, which provides manufacturing and other services for treatments developed from proteins, viruses, blood, and living organisms, including COVID-19 treatments; and (2) PCH, which is responsible for the mass production of pills and gummies. The Biologics and PCH segments each generate approximately 50% of the Company's total revenue.

121.    Catalent's direct customers, referred to as "channel partners," are ordinarily pharmaceutical companies—including, but not limited to, AstraZeneca, Bristol-Myers Squibb, GlaxoSmithKline, Johnson & Johnson, Moderna, and Pfizer—and the Company provides these channel partners with various manufacturing services. Among other services, Catalent fills

syringes with the channel partners' vaccines, which syringes later get packaged and shipped to the channel partners. The channel partners are thereafter responsible for distributing these products to healthcare providers.

122.     The agreements Catalent enters into with its channel partners are structured to be long-term, so that the channel partners continuously provide the Company with inventory. Moreover, the agreements (a) purportedly provide Catalent with strong insight into channel partners' needs, particularly in regard to the inventory level necessary to adequately serve the end consumers' demand; and (b) dictate, in part, the benchmarks the Company must meet in order to recognize revenue. In accordance with GAAP, the Company must recognize revenue on these long-term agreements once it meets certain objective milestones. However, the Company recognizes a substantial amount of this revenue *prior to* billing its customers, thereby reducing third-party transparency and making these long-term agreements highly vulnerable to accounting fraud effectuated through recognizing revenue prematurely.

123.     The Company's quarterly revenue averaged $669 million between April 2018 and March 2020, with its stock price averaging at a closing price of $47.57 per share during this period.

124.     Thereafter, beginning in March 2020, Catalent experienced significant growth largely due to business opportunities presented to the Company as a result of the COVID-19 pandemic.

### *Catalent Experiences Significant Growth as a Result of COVID-19*

125.     In March 2020, Catalent—particularly, the Company's Biologics segment— began to experience a period of massive growth brought on by COVID-19 and the related demand for vaccines and related healthcare products. Around this time, the Company received

opportunities to work on more than 100 COVID-related products from more than sixty clients, including filling COVID vaccines into syringes for Moderna and AstraZeneca, two of the Company's channel partners.

126.    Due to increasing demand for the Company's services, Catalent began expanding its facilities. At the same time, Defendants boasted of Catalent's ability to gauge customer demand, providing the market with very strong revenue guidance.

127.    As a result of Catalent's COVID-related projects, the Company's revenues soared to record highs, averaging at $940 million between April 2020 and March 2021, which, notably, represented a 40% increase from pre-COVID revenues. Similarly, during this time, the Company's stock was closing at an average price of $102.42 per share.

**The Facility Misconduct and Resulting FDA Investigations**

128.    As a result of this quick expansion in the Company's production activity, numerous of Catalent's facilities began experiencing significant issues. The Company largely produces its products out of its two key production facilities: (a) the Bloomington Facility and (b) the Brussels Facility. The Company's facilities must follow CGMP, which are quality and safety control regulations that are enforced by the FDA.

129.    Throughout the Relevant Period, the Company received at least three Form 483s from the FDA. Form 483s are issued by the FDA to firm management when the agency has finished an inspection and found conditions that may constitute statutory violations, including CGMP violations. CGMP violations include, but are not limited to, conditions or practices indicating that any drug or device has been adulterated or is being prepared, packed, or held under conditions whereby it may become adulterated or, similarly, rendered injurious to health.

130.    Between October 18, 2021 and October 26, 2021, the FDA inspected the

39

Company's Brussels Facility. On October 26, 2021, based on the results of its inspection, the FDA issued a Form 483 to the Company, informing Catalent that the agency had noticed numerous infractions at the Brussels Facility, including ***faulty air filtration systems, alarming bacteria growth, and subpar equipment maintenance***.

131.     Similarly, between August 1, 2022 and September 1, 2022, the FDA inspected the Company's Bloomington Facility. On September 1, 2022, based on the results of its inspection, the FDA issued a Form 483 to the Company, informing Catalent that the agency had noticed numerous infractions at the Bloomington Facility, including ***discovering foreign matter, particular matter, and foreign objects and pieces in vials*** produced at the Bloomington Facility, in addition to issues with control procedures.

132.     Weeks later, between August 10, 2022 and August 19, 2022, the FDA conducted another inspection of the Brussels Facility and issued a Form 483 to the Company on August 19, 2022, this time detailing problems with air filters and other equipment-related issues at the Brussels Facility.

133.      Despite knowing about these pervasive issues with Catalent's production facilities, throughout the Relevant Period, the Individual Defendants concealed this reality from investors, instead making a series of false and misleading statements (discussed in more detail below) touting, among other things, Catalent's "***rigorous quality and operational standards***."

### *Demand for Company's COVID Products Wanes*

134.     Worsening matters, demand for the Company's COVID-19 products began to decrease by mid-2021, with a significant number of potential patients already having received COVID-19 vaccinations by this point. Despite this decrease in demand, Defendants continued to tout growing revenues and strong customer demand for Catalent's products and services.

135.    Notably, during the Relevant Period, the Company was reporting average quarterly revenue of $1.2 billion, which represented an ***80% increase over the Company's pre-COVID-19 revenues*** and a 28% increase over its reported revenues for the first year of the pandemic. Company investors were unaware that Defendants had artificially inflated these revenues by way of undertaking fraudulent accounting and channel stuffing schemes. These schemes were intended to make investors believe the Company was stronger and more profitable than it truly was.

136.    On September 9, 2021, as a result of Defendants' fraud, Catalent stock traded at a record high of $142.64 per share. Similarly, throughout the Relevant Period, the Company's stock was trading at an average price of $108.00 per share.

**<u>False and Misleading Statements</u>**

***August 30, 2021 Form 10-K, Press Release, and Earnings Call***

137.    The Relevant Period begins on August 30, 2021. That day, the Company filed its annual report on Form 10-K with the SEC for the fiscal year ended June 30, 2021 ("Fiscal Year 2021") (the "2021 10-K"), which was signed by Defendants Chiminski, Balachandran, Barber, Carroll, Classon, Crane, Greisch, Kreuzburg, Lucier, Morel, Stahl, Zippelius, and Castellano. Attached to the 2021 10-K were certifications pursuant to Rules 13a-14(a) and 15(d)-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Chiminski and Castellano attesting to the accuracy of the 2021 10-K.

138.    The 2021 10-K represented to investors that, for Fiscal Year 2021, the Company generated $3.998 billion in net revenue and $585 million in net earnings.

139.    The 2021 10-K also noted that the Company "provide[s] differentiated development and manufacturing solutions for drugs, protein-based biologics, cell and gene

therapies, and consumer health products at over fifty facilities across four continents **under rigorous quality and operational standards**." (Emphasis added.)

140.     Regarding the Company's "quality and regulatory track record," the 2021 10-K represented the following:

> *We operate our plants in accordance with current good manufacturing practices ("cGMP") or other applicable requirements, following our own high standards that are consistent with those of many of our large global pharmaceutical and biotechnology customers.* We have approximately 1,600 employees around the globe focused on quality and regulatory compliance. All of our facilities are registered where required with the FDA or other applicable regulatory agencies, such as the European Medicines Agency (the "EMA"). In many cases, our facilities are registered with multiple food, drug, or biologics regulatory agencies around the world. In fiscal 2021, we were subject to 52 regulatory audits, and, over the last five fiscal years, we successfully completed approximately 300 regulatory audits. We also undergo more than 500 customer and internal audits annually. *We believe our quality and regulatory track record to be a favorable competitive differentiator.*

(Emphasis added.)

141.     The same day, Catalent issued a press release wherein the Company announced its financial results for the fourth fiscal quarter ended June 30, 2021 ("Q4 2021"). The press release represented to investors that, during Q4 2021, the Company generated $1.188 billion in net revenue and $182 million in net earnings.

142.     Also on August 30, 2021, Catalent held an earnings conference call to discuss its financial results for Q4 2021 (the "Q4 2021 Earnings Call"). During the Q4 2021 Earnings Call, Defendant Chiminski represented that Catalent saw "vaccines for COVID specifically being really much more of a sustaining and an enduring revenue for Catalent." Defendant Chiminski further noted that the Company's outlook was that "vaccines [would continue] to play a strong role into the future without any, I would say, substantial cliff in terms of the business since we'll be dovetailing in some of our strong pipeline along with the continued sustained supply required

for the COVID vaccine."

143.     The above statements identified in ¶¶137-142 were materially false and misleading because Defendants failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) by prematurely recognizing revenue in violation of U.S. GAAP, the Company materially overstated its revenue and earnings; (ii) the Company had material weaknesses in its internal control over financial reporting, particularly as it pertained to revenue recognition; (iii) the Company falsely represented demand for its products while it knowingly sold more product to its direct customers than could be sold to healthcare providers and end customers; and (iv) the Company violated regulatory rules at key production facilities as a way to rapidly produce excess inventory, which was later used to inflate the Company's financial results through premature revenue recognition in violation of GAAP and/or stuffing its direct customers with this excess inventory. As a result, the Company's public statements were materially false and misleading at all relevant times.

### *November 2, 2021 Form 10-Q and Earnings Call*

144.     On November 2, 2021, Catalent filed its quarterly report on Form 10-Q with the SEC for the quarterly period ended September 30, 2021 ("Q1 2022") (the "Q1 2022 10-Q"). Attached to the Q1 2022 10-Q were certifications pursuant to Rules 13a-14(a) and 15(d)-14(a) under the Exchange Act and SOX signed by Defendants Chiminski and Castellano attesting to the accuracy of the Q1 2022 10-Q.

145.     The Q1 2022 10-Q represented to investors that, for Q1 2022, the Company generated $1.025 billion in net revenue and $93 million in net earnings.

146.     The same day, Catalent hosted an earnings call to discuss its financial results for

Q1 2022 (the "Q1 2022 Earnings Call"). On the Q1 2022 Earnings Call, Defendant Castellano represented to investors that:

> [The Company continues] to see COVID demand as having a multiyear duration. We're still in the very early stages in terms of worldwide vaccine populations and what we're seeing from a booster demand perspective as well as younger age populations get approved for the vaccine, et cetera, continue to give us confidence that this is going to be around for a multiyear duration, including into the fiscal '23 year.

147. Also during the Q1 2022 Earnings Call, Defendant Chiminski touted Catalent's ability to gauge consumer demand for various of its key products not related to COVID-19, stating that Catalent had increased "visibility to the customer demand and needs of that business." In addition, Defendant Chiminski represented that the Company's Biologics segment was "***driven by continued high demand from COVID-19 projects . . . again the top contributor to Catalent's financial performance***" and that "robust net revenue growth was organic and was driven by ***high demand for drug product and drug substance offerings*** in the U.S. and Europe, ***most notably for COVID-related programs***." (Emphasis added.)

### *January 10, 2022 JPMorgan Healthcare Conference*

148. On January 10, 2022, Defendant Chiminski spoke at the JPMorgan Healthcare Conference. During the conference, Defendant Chiminski represented that Catalent had visibility into "continuing demand [for vaccines] into [2023]." Defendant Chiminski also stated that vaccines were "an enduring franchise for Catalent."

### *February 1, 2022 Form 10-Q and Earnings Call*

149. On February 1, 2022, Catalent filed its quarterly report on Form 10-Q with the SEC for the quarterly period ended December 31, 2021 ("Q2 2022") (the "Q2 2022 10-Q"). Attached to the Q2 2022 10-Q were certifications pursuant to Rules 13a-14(a) and 15(d)-14(a) under the Exchange Act and SOX signed by Defendants Chiminski and Castellano attesting to

the accuracy of the Q2 2022 10-Q.

150.     The Q2 2022 10-Q represented to investors that, for Q2 2022, the Company generated $1.217 billion in net revenue and $97 million in net earnings.

151.     The same day, Catalent hosted an earnings call to discuss its financial results for Q2 2022 (the "Q2 2022 Earnings Call"). On the Q2 2022 Earnings Call, Defendant Maselli represented to investors that the Company's "long-term strategic plan does not assume that the pandemic-related demand for vaccines will continue in [future] years." Defendant Maselli also expressed his belief that the Company had "always been very, very ***thorough in collaboration with all the regulatory agencies.***" (Emphasis added.)

### May 3, 2022 Form 10-Q and Earnings Call

152.     On May 3, 2022, Catalent filed its quarterly report on Form 10-Q with the SEC for the quarterly period ended March 31, 2022 ("Q3 2022") (the "Q3 2022 10-Q"). Attached to the Q3 2022 10-Q were certifications pursuant to Rules 13a-14(a) and 15(d)-14(a) under the Exchange Act and SOX signed by Defendants Chiminski and Castellano attesting to the accuracy of the Q3 2022 10-Q.

153.     The Q3 2022 10-Q represented to investors that, for Q3 2022, the Company generated $1.273 billion in net revenue and $141 million in net earnings.

154.     The same day, Catalent hosted an earnings call to discuss its financial results for Q3 2022 (the "Q3 2022 Earnings Call"). On the Q3 2022 Earnings Call, Defendant Chiminski represented to investors that "***[d]emand remain[s] strong in [the Biologics] segment***, including a notable increase from several of our large gene therapy customers for viral vector manufacturing." (Emphasis added.) Defendant Chiminski further noted that Catalent "project[ed] . . . ***continued demand in the years ahead.***" (Emphasis added.)

155.    Later on the Q3 2022 Earnings Call, Defendant Castellano was asked if the Company was seeing its customers build stockpiles in the products the Company provides. In response, Defendant Castellano stated, "***I'm certainly not hearing or seeing that . . . [N]ot something I'm seeing or hearing across the business.***" (Emphasis added.) Similarly, in response to the same question, Defendant Maselli stated "***[W]e are not seeing that happening across the board. I believe that this is also due to the fact that many areas, at the end, the demand of the market is really strong.*** So we are now refocusing on making sure that the market is served with all capacity that we are deploying *in those high-demand areas*." (Emphasis added.)

156.    During the call, Defendant Castellano was also asked a question regarding the decline in the Company's COVID-19 business. In response, Defendant Castellano stated that Catalent had "considerably derisked the overall contributions here . . . as part of the fiscal '23 and ***continue to have a line of sight to growth despite that declining demand profile of COVID-related vaccine revenue*** to the 8% to 10% long-term growth target that we have in place for the consolidated company." (Emphasis added.)

157.    The above statements identified in ¶¶144-156 were materially false and misleading because Defendants failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) by prematurely recognizing revenue in violation of U.S. GAAP, the Company materially overstated its revenue and earnings; (ii) the Company had material weaknesses in its internal control over financial reporting, particularly as it pertained to revenue recognition; (iii) the Company falsely represented demand for its products while it knowingly sold more product to its direct customers than could be sold to healthcare providers

and end customers; and (iv) the Company violated regulatory rules at key production facilities as a way to rapidly produce excess inventory, which was later used to inflate the Company's financial results through premature revenue recognition in violation of GAAP and/or stuffing its direct customers with this excess inventory. As a result, the Company's public statements were materially false and misleading at all relevant times.

**The Truth Begins to Emerge as the False and Misleading Statements Continue**

*August 29, 2022 Disclosure*

158.    The truth began to emerge on August 29, 2022 when Catalent disclosed its financial results for Fiscal Year 2022. That day, Catalent revealed that, contrary to the representations it had repeatedly made throughout the Relevant Period touting the continuous and significant demand for the Company's products and services, the reality was that demand for the Company's COVID-related products and services was waning, resulting in Catalent reporting sales that fell below consensus expectations for Fiscal Year 2022.

159.    On this news, the Company's stock price fell $7.42 per share, or 7.4%, from a closing price of $99.70 per share on August 28, 2022, to close at $92.28 per share on August 29, 2022.

160.    Still, Defendants continued to issue false and misleading statements regarding the demand for Catalent's products, the quality control at the Company's facilities, and Catalent's total revenue and earnings.

*August 29, 2022 Form 10-K and Earnings Call*

161.    On August 29, 2022, the Company filed its annual report on Form 10-K with the SEC for Fiscal Year 2022 (the "2022 10-K"), which was signed by Defendants Maselli, Chiminski, Balachandran, Barber, Carroll, Classon, Crane, Greisch, Kreuzburg, Lucier, Morel,

Stahl, Zippelius, and Castellano. Attached to the 2022 10-K were certifications pursuant to Rules 13a-14(a) and 15(d)-14(a) under the Exchange Act and SOX signed by Defendants Maselli and Castellano attesting to the accuracy of the 2022 10-K.

162.    The 2022 10-K represented to investors that, for Fiscal Year 2022, the Company generated $4.828 billion in net revenue and $519 million in net earnings.

163.    Also on August 29, 2022, Catalent reported its financial results for the quarterly period ended June 30, 2022 ("Q4 2022"), disclosing that the Company generated $1.313 billion in net revenue and $188 million in net earnings during Q4 2022.

164.    Regarding the Company's "quality and regulatory track record," the 2022 10-K represented the following:

> ***We operate our plants in accordance with current good manufacturing practices ("cGMP") or other applicable requirements, following our own high standards that are consistent with those of many of our large global pharmaceutical and biotechnology customers.*** We have approximately 1,900 employees around the globe focused on quality and regulatory compliance. All of our facilities are registered where required with the FDA or other applicable regulatory agencies, such as the European Medicines Agency (the "EMA"). In many cases, our facilities are registered with multiple food, drug, or biologics regulatory agencies around the world. In fiscal 2022, we were subject to 54 regulatory audits, and, over the last five fiscal years, we successfully completed approximately 300 regulatory audits. We also undergo more than 700 customer and internal audits annually. ***We believe our quality and regulatory track record to be a favorable competitive differentiator.***

(Emphasis added.)

165.    The same day, Catalent held an earnings conference call to discuss its financial results for Q4 2022 (the "Q4 2022 Earnings Call"). During the Q4 2022 Earnings Call, Defendant Maselli represented that, regarding demand for the Company's COVID-related products and services, Catalent had "much better visibility." Defendant Maselli further stated that the Company had "pretty [good] visibility" of its prescription business and that the pipeline

for the prescription business was strong. In addition, Defendant Maselli noted that Catalent expected its growth to be "driven by [its] non-COVID business." Finally, Defendant Maselli stated that Catalent's "growth was primarily driven by broad demand for our biologics offering, including the demand for COVID-19-related products, increased demand for our customer prescription products, and a rebound in demand for our consumer health products."

166.    The above statements identified in ¶¶161-165 were materially false and misleading because Defendants failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) by prematurely recognizing revenue in violation of U.S. GAAP, the Company materially overstated its revenue and earnings; (ii) the Company had material weaknesses in its internal control over financial reporting, particularly as it pertained to revenue recognition; (iii) the Company falsely represented demand for its products while it knowingly sold more product to its direct customers than could be sold to healthcare providers and end customers; and (iv) the Company violated regulatory rules at key production facilities as a way to rapidly produce excess inventory, which was later used to inflate the Company's financial results through premature revenue recognition in violation of GAAP and/or stuffing its direct customers with this excess inventory. As a result, the Company's public statements were materially false and misleading at all relevant times.

### September 16, 2022 Proxy Statement

167.    On September 16, 2022, Catalent filed the 2022 Proxy Statement with the SEC. Defendants Chiminski, Balachandran, Barber, Carroll, Classon, Crane, Greisch, Kreuzburg, Lucier, Maselli, Morel, Stahl, Zippelius, and non-party Karen Flynn solicited the 2022 Proxy Statement, filed pursuant to Section 14(a) of the Exchange Act, which contained material

misstatements and omissions.

168.    The 2022 Proxy Statement called for shareholder approval of, *inter alia*, (1) the reelection of directors Chiminski, Balachandran, Barber, Carroll, Classon, Crane, Greisch, Kreuzburg, Lucier, Maselli, Morel, Stahl, Zippelius, and non-party Karen Flynn to the Board; (2) the appointment of Ernst & Young LLP as the Company's independent auditor for fiscal 2023; and (3) on an advisory and non-binding basis, the Company's executive compensation ("say-on-pay").

169.    With respect to Risk Oversight, the 2022 Proxy Statement stated the following, in relevant part:

> Our Board as a whole and through its committees oversees our risk management, with senior management regularly reporting on areas of material risk. ***Our Board regularly reviews information regarding our strategy, finances, liquidity, operations, legal and regulatory developments, our research and development activities, and our competitive environment, as well as the risks related to these matters.***
>
> The Audit Committee oversees the management of risks related to financial reporting and monitors the annual internal audit risk assessment, which identifies and prioritizes risks related to our internal controls in order to develop internal audit plans for future fiscal years. The Audit Committee also periodically meets with members of our information technology department to assess information security risks (including cybersecurity risks) and to evaluate the status of our cybersecurity efforts, which include a broad range of tools and training initiatives that are designed to work together to protect the data and systems used in our business. The Board meets annually with members of the information technology department to review information security risks, including cybersecurity risks, and to evaluate the status of our cybersecurity efforts, and the Audit Committee meets with these members at quarterly intervals during the remainder of each year.
>
> ***
>
> Each of the Board's committees provides periodic reports, generally quarterly, to the full Board regarding its area of responsibility and oversight. We do not believe there is any relationship between how our Board oversees management of our risks and its leadership structure.

(Emphasis added.)

170.     Regarding the Code of Conduct, the 2022 Proxy Statement stated the following, in relevant part:

> Our Board and all of our employees, including our CEO, principal financial officer, principal accounting officer, and all other executive officers are required to abide by our Standards of Business Conduct to ensure that our business is conducted in a consistently legal and ethical manner. A copy of our Standards of Business Conduct can be found on our website at investor.catalent.com/corporate-governance. ***We will disclose on our website any future amendment to, or waiver from, provisions of our Standards of Business Conduct affecting our directors or executive officers as and to the extent required under applicable SEC and NYSE rules.***

(Emphasis added.)

171.     The 2022 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Company's Code of Conduct was not followed, as evidenced by the Individual Defendants (1) making and/or causing the Company to make the numerous false and misleading statements and omissions alleged herein; and (2) failing to report violations of the Code of Conduct. Further, the 2022 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Board was not adequately performing its risk oversight functions.

172.     The 2022 Proxy Statement also failed to disclose, *inter alia*, that: (i) by prematurely recognizing revenue in violation of U.S. GAAP, the Company materially overstated its revenue and earnings; (ii) the Company had material weaknesses in its internal control over financial reporting, particularly as it pertained to revenue recognition; (iii) the Company falsely represented demand for its products while it knowingly sold more product to its direct customers than could be sold to healthcare providers and end customers; and (iv) the Company violated regulatory rules at key production facilities as a way to rapidly produce excess inventory, which was later used to inflate the Company's financial results through premature revenue recognition

in violation of GAAP and/or stuffing its direct customers with this excess inventory. As a result, the Company's public statements were materially false and misleading at all relevant times.

173.    As a result of Defendants Chiminski, Balachandran, Barber, Carroll, Classon, Crane, Greisch, Kreuzburg, Lucier, Maselli, Morel, Stahl, Zippelius, and non-party Karen Flynn causing the 2022 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to re-elect Defendants Chiminski, Balachandran, Barber, Carroll, Classon, Crane, Greisch, Kreuzburg, Lucier, Maselli, Morel, Stahl, and Zippelius to the Board, thus allowing them to continue breaching their fiduciary duties to the Company.

## **THE TRUTH EMERGES**

### *September 20, 2022 Washington Post Article*

174.    On September 20, 2022, after the close of trading, the truth continued to emerge when the *Washington Post* published an article titled "FDA releasing millions of Moderna boosters as states warn of shortages." The article revealed that, as a result of the FDA's inspection of the Bloomington Facility, the FDA was delaying the release of millions of COVID-19 vaccine booster shots previously filled by the Company. The article further revealed that FDA agents had expressed concern that vaccine vials packaged at the Bloomington Facility could be contaminated as a result of the facility not being sufficiently sterile.

175.    On this news, the Company's stock price fell $8.09 over the following two trading periods, or 9.3%, from a closing price of $87.15 per share on September 20, 2022, to close at $79.06 per share on September 22, 2022. At this point, investors still were unaware of the severity of the Company's losses which resulted from Catalent cutting corners at its key facilities.

### *November 1, 2022 Earnings Report and Earnings Call*

176.    The truth fully emerged on November 1, 2022 when the Company reported its financial results for Q1 2023. That day, the Company announced that, for Q1 2023, Catalent's **earnings had fallen to zero** and that the Company was lowering its guidance for fiscal year 2023 from a range of $4.975 billion to $5.225 billion, to a new range of $4.625 billion to $4.875 billion. This news fully revealed to investors for the first time that demand for the Company's products and services was much weaker than the Defendants had continuously touted throughout the Relevant Period.

177.    The public responded negatively to these revelations. Indeed, Barclays published a piece wherein one of its analysts stated the following about Catalent's business:

> It is really hard to gain comfort in a business that suddenly turns negative on the macro in a matter of a few weeks when it is supposed to be long-cycle and have high visibility. Especially when the guide was supposedly set conservatively to start the year . . . Overall, this was a very hard quarter to stomach after recommending the stock for so long.

178.    The same day, Catalent held an earnings call with analysts and investors to discuss its financial results for Q1 2023 (the "Q1 2023 Earnings Call"). During the Q1 2023 Earnings Call, Defendant Maselli revealed that Catalent was anticipating "negative P&L [profit and loss] effects," as the Company attempted to address the observations of regulatory violations made by the FDA during their numerous inspections of the Company's facilities.

179.    On this news, the Company's stock price declined by $20.83, or **31.7% over two trading sessions**, from a closing price of $65.73 per share on October 31, 2022 to close at $44.90 per share on November 2, 2022.

### Subsequent Developments

180.    In the following weeks, the Company's stock price continued to plummet. On November 16, 2022, the Company informed investors that it had approximately $400 million

that it was carrying in excess inventory, further illustrating that Defendants had misrepresented the demand for Catalent's products and the Company's ability to gauge future customer demand throughout the Relevant Period.

181.    On this news, the Company's stock declined by $6.84 over two trading periods, from a closing price of $48.91 on November 15, 2022, to close at $42.07 per share on November 17, 2022.

182.    Later, on December 8, 2022, GlassHouse Research issued a report which alleged that the Company had been violating GAAP by materially overstating its revenues by $568.2 million. GlassHouse Research's report further revealed a series of red flags at the Company—including the rapid increase in the Company's contract asset and inventory balances, declining customer deposits, executive turnover, and regulators' recent scrutiny of Catalent's revenue accounting—which indicated that the Company was engaging in improper accounting practices. In addition, the report noted that the Company's direct customers were stuffed with excess inventory which "will take years to unwind."

183.    On this news, the Company's stock price declined by $1.68, or 3.6%, from a closing price of $47.22 per share on December 7, 2022, to close at $45.54 per share on December 8, 2022.

184.    In the following months and up to the present, the Company has failed to remediate the plethora of issues at its production facilities, resulting in further scrutiny from the FDA and harm to the Company's reputation. Indeed, between May 4, 2023 and May 12, 2023, the FDA inspected the Company's Bloomington Facility and issued the Company another Form 483, this time for numerous infractions at the Bloomington Facility, including, among other

things, missed sanitization procedures, equipment issues, and inadequate maintenance.[3]

185.    The Facility Misconduct has also caused significant harm to the Company's channel partners. For example, on June 23, 2023, Bloomberg reported that the FDA had rejected the drug application of Regeneron Pharmaceuticals Inc., one of the Company's channel partners, for a stronger formulation of its best-selling eye medicine "solely due to an ongoing review of inspection findings at [the Bloomington Facility.]"[4]

## DAMAGES TO CATALENT

186.    As a direct and proximate result of the Individual Defendants' conduct, Catalent has lost and will continue to lose and expend many millions of dollars.

187.    Such expenditures include, but are not limited to, the fees associated with the Securities Class Action filed against the Company and the Company's CEO, former CEO, and former CFO, and any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

188.    Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

189.    As a direct and proximate result of the Individual Defendants' conduct, Catalent has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

---

[3]    https://www.fiercepharma.com/manufacturing/catalents-indiana-site-linked-regenerons-high-dose-eylea-rejection-dinged-three
[4]    https://www.bloomberg.com/news/articles/2023-06-28/catalent-ctlt-linked-to-regeneron-regn-eye-drug-delay-in-latest-misstep

## DERIVATIVE ALLEGATIONS

190.     Plaintiff brings this action derivatively and for the benefit of Catalent to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Catalent, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of the Exchange Act, as well as for contribution under Sections 10(b) and 21D of the Exchange Act.

191.     Catalent is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

192.     Plaintiff is, and has been at all relevant times, a shareholder of Catalent. Plaintiff will adequately and fairly represent the interests of Catalent in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY

193.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

194.     A pre-suit demand on the Board is futile and, therefore, excused. When this action was filed, Catalent's Board consisted of the following fifteen individuals: Defendants Balachandran, Barber, Carroll, Classon, Crane, Greisch, Kreuzburg, Lucier, Maselli, Morel, and Stahl (the "Director-Defendants"), and non-parties Frank D'Amelio, Karen Flynn, Stephanie Okey, and Michelle Ryan (together with the "Director-Defendants," the "Directors"). Plaintiff needs only to allege demand futility as to eight of the fifteen Directors that were on the Board at the time this action was filed.

195.     Demand is excused as to all of the Director-Defendants because each of them

faces, individually and collectively, a substantial likelihood of liability as a result of the schemes they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts and to participate in the Facility Misconduct. This renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the schemes.

196.     Moreover, each of the Director-Defendants, that is, Balachandran, Barber, Carroll, Classon, Crane, Greisch, Kreuzburg, Lucier, Maselli, Morel, and Stahl, solicited the 2022 Proxy Statement to call for a shareholder vote to, *inter alia*, re-elect themselves to the Board, thus allowing them to continue breaching their fiduciary duties to Catalent.

197.     In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted Catalent to issue materially false and misleading statements. Specifically, the Director-Defendants caused Catalent to issue false and misleading statements which were intended to make Catalent appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

198.     Additional reasons that demand on Defendant Maselli is futile follow. Defendant Maselli serves as CEO of the Company and has served as a Company director since July 2022. As such, the Company provides Defendant Maselli with his principal occupation for which he receives lucrative compensation. Thus, as the Company admits, he is a non-independent director. As CEO and a director throughout the Relevant Period, Defendant Maselli was ultimately

responsible for the false and misleading statements and omissions that were made by or on behalf of the Company. In addition, Defendant Maselli solicited the 2022 Proxy Statement which contained false and misleading elements that contributed, *inter alia*, to shareholders reelecting him to the Board. Defendant Maselli also signed the 2022 10-K, which contained false and misleading elements. As the Company's highest officer and a trusted Company director, he conducted little, if any, oversight of the schemes to cause the Company to engage in the Facility Misconduct and make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. In addition, Defendant Maselli's insider sales, which yielded approximately $565,953 in proceeds, demonstrate his motive in facilitating and participating in the fraud. Moreover, Defendant Maselli is a defendant in the Securities Class Action. For these reasons, Defendant Maselli breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

199.    Additional reasons that demand on Defendant Balachandran is futile follow. Defendant Balachandran has served as a Company director since May 2017. He is also a member of the Nominating and Corporate Governance Committee and the Quality and Regulatory Compliance Committee. Defendant Balachandran has received and continues to receive compensation for his role as a director as described above. In addition, Defendant Balachandran solicited the 2022 Proxy Statement which contained false and misleading elements that contributed, *inter alia*, to shareholders reelecting him to the Board. Moreover, Defendant Balachandran signed the 2021 and 2022 10-Ks, each of which contained false and misleading elements. As a trusted Company director, he conducted little, if any, oversight of the schemes to

cause the Company to engage in the Facility Misconduct and make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. This is even more alarming considering his extensive background in the pharmaceutical industry. For these reasons, Defendant Balachandran breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

200.     Additional reasons that demand on Defendant Barber is futile follow. Defendant Barber has served as a Company director since April 2021. He is also a member of the Compensation Committee and the Quality and Regulatory Compliance Committee. Defendant Barber has received and continues to receive compensation for his role as a director as described above. In addition, Defendant Barber solicited the 2022 Proxy Statement which contained false and misleading elements that contributed, *inter alia*, to shareholders reelecting him to the Board. Moreover, Defendant Barber signed the 2021 and 2022 10-Ks, each of which contained false and misleading elements. As a trusted Company director, he conducted little, if any, oversight of the schemes to cause the Company to engage in the Facility Misconduct and make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Barber breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

201.     Additional reasons that demand on Defendant Carroll is futile follow. Defendant Carroll has served as a Company director since July 2015. He is also a member of the Mergers

and Acquisitions Committee. Defendant Carroll has received and continues to receive compensation for his role as a director as described above. In addition, Defendant Carroll solicited the 2022 Proxy Statement which contained false and misleading elements that contributed, *inter alia*, to shareholders reelecting him to the Board. Moreover, Defendant Carroll signed the 2021 and 2022 10-Ks, each of which contained false and misleading elements. As a trusted Company director, he conducted little, if any, oversight of the schemes to cause the Company to engage in the Facility Misconduct and make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. This is even more alarming considering his extensive background in the pharmaceutical industry. For these reasons, Defendant Carroll breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

202.    Additional reasons that demand on Defendant Classon is futile follow. Defendant Classon has served as a Company director since August 2014. He is also a member of the Audit Committee and Compensation Committee. Defendant Classon has received and continues to receive compensation for his role as a director as described above. In addition, Defendant Classon solicited the 2022 Proxy Statement which contained false and misleading elements that contributed, *inter alia*, to shareholders reelecting him to the Board. Moreover, Defendant Classon signed the 2021 and 2022 10-Ks, each of which contained false and misleading elements. As a trusted Company director, he conducted little, if any, oversight of the schemes to cause the Company to engage in the Facility Misconduct and make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and

engagement in the schemes, and consciously disregarded his duties to protect corporate assets. This is even more alarming considering his extensive background in the healthcare industry. For these reasons, Defendant Classon breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

203.    Additional reasons that demand on Defendant Crane is futile follow. Defendant Crane has served as a Company director since February 2018. She is also a member of the Audit Committee and Nominating and Corporate Governance Committee. Defendant Crane has received and continues to receive compensation for her role as a director as described above. In addition, Defendant Crane solicited the 2022 Proxy Statement which contained false and misleading elements that contributed, *inter alia*, to shareholders reelecting her to the Board. Moreover, Defendant Crane signed the 2021 and 2022 10-Ks, each of which contained false and misleading elements. As a trusted Company director, she conducted little, if any, oversight of the schemes to cause the Company to engage in the Facility Misconduct and make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the schemes, and consciously disregarded her duties to protect corporate assets. This is even more alarming considering her extensive background in the pharmaceutical industry. For these reasons, Defendant Crane breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

204.    Additional reasons that demand on Defendant Greisch is futile follow. Defendant Greisch has served as a Company director since February 2018. He is also Chair of the Audit Committee and a member of the Compensation Committee. Defendant Greisch has received and

continues to receive compensation for his role as a director as described above. In addition, Defendant Greisch solicited the 2022 Proxy Statement which contained false and misleading elements that contributed, *inter alia*, to shareholders reelecting him to the Board. Moreover, Defendant Greisch signed the 2021 and 2022 10-Ks, each of which contained false and misleading elements. As a trusted Company director, he conducted little, if any, oversight of the schemes to cause the Company to engage in the Facility Misconduct and make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Greisch breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

205.    Additional reasons that demand on Defendant Kreuzburg is futile follow. Defendant Kreuzburg has served as a Company director since February 2018. She is also Chair of the Nominating and Corporate Governance Committee and a member of the Quality and Regulatory Compliance Committee. Defendant Kreuzburg has received and continues to receive compensation for her role as a director as described above. In addition, Defendant Kreuzburg solicited the 2022 Proxy Statement which contained false and misleading elements that contributed, *inter alia*, to shareholders reelecting her to the Board. Moreover, Defendant Kreuzburg signed the 2021 and 2022 10-Ks, each of which contained false and misleading elements. As a trusted Company director, she conducted little, if any, oversight of the schemes to cause the Company to engage in the Facility Misconduct and make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the schemes, and consciously disregarded her duties to protect corporate assets.

This is even more alarming considering her extensive background in the healthcare industry. For these reasons, Defendant Kreuzburg breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

206.     Additional reasons that demand on Defendant Lucier is futile follow. Defendant Lucier has served as a Company director since April 2015. He is also Chair of the Compensation Committee and a member of the Mergers and Acquisitions Committee. Defendant Lucier has received and continues to receive compensation for his role as a director as described above. In addition, Defendant Lucier solicited the 2022 Proxy Statement which contained false and misleading elements that contributed, *inter alia*, to shareholders reelecting him to the Board. Moreover, Defendant Lucier signed the 2021 and 2022 10-Ks, each of which contained false and misleading elements. In addition, Defendant Lucier's insider sale, which yielded approximately $645,511 in proceeds, demonstrates his motive in facilitating and participating in the fraud. As a trusted Company director, he conducted little, if any, oversight of the schemes to cause the Company to engage in the Facility Misconduct and make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. This is even more alarming considering his extensive background in the pharmaceutical industry. For these reasons, Defendant Lucier breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

207.     Additional reasons that demand on Defendant Morel is futile follow. Defendant Morel has served as a Company director since November 2015. He is also Chair of the Quality

and Regulatory Compliance Committee. Defendant Morel has received and continues to receive compensation for his role as a director as described above. In addition, Defendant Morel solicited the 2022 Proxy Statement which contained false and misleading elements that contributed, *inter alia*, to shareholders reelecting him to the Board. Moreover, Defendant Morel signed the 2021 and 2022 10-Ks, each of which contained false and misleading elements. As a trusted Company director, he conducted little, if any, oversight of the schemes to cause the Company to engage in the Facility Misconduct and make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. This is even more alarming considering his extensive background in the pharmaceutical industry. For these reasons, Defendant Morel breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

208.    Additional reasons that demand on Defendant Stahl is futile follow. Defendant Stahl has served as a Company director since August 2014. He is also Chair of the Mergers and Acquisitions Committee and a member of the Audit Committee. Defendant Stahl has received and continues to receive compensation for his role as a director as described above. In addition, Defendant Stahl solicited the 2022 Proxy Statement which contained false and misleading elements that contributed, *inter alia*, to shareholders reelecting him to the Board. Moreover, Defendant Stahl signed the 2021 and 2022 10-Ks, each of which contained false and misleading elements. As a trusted Company director, he conducted little, if any oversight of the schemes to cause the Company to engage in the Facility Misconduct and make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets.

For these reasons, Defendant Stahl breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

209.    Additional reasons that demand on the Board is futile follow.

210.    Defendants Classon, Crane, Stahl, and Greisch (collectively, the "Audit Committee Defendants") served as members of the Audit Committee at all relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of Conduct. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

211.    Defendants Balachandran, Barber, Kreuzburg, and Morel (collectively, the "Quality Committee Defendants") served as members of the Quality and Regulatory Committee at all relevant times. As such, they were responsible for reviewing and overseeing the quality assurance procedures the Company had in place for its products and services, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Quality Charter by failing to adequately review and oversee the activities, processes, and procedures by which the Company assures the quality of the products and services it delivers;

review the status of the Company's compliance with laws, regulations, and internal procedures relating to quality, safety, efficacy, or handling with regard to the Company's products and related services and their consistency with industry best practices; and review and evaluate internal reports and external data to assess whether there is any significant concern regarding the Company's regulatory and/or compliance practices. Thus, the Quality Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

212. In violation of the Code of Conduct, the Director-Defendants engaged in or permitted the schemes to cause the Company to engage in the Facility Misconduct and make false and misleading statements to the investing public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In addition, the Individual Defendants violated the Code of Conduct by failing to act with integrity, failing to avoid conflicts of interest, failing to ensure the Company's disclosures were accurate, failing to ensure the Company complied with applicable laws, rules, and regulations, and failing to promptly report known violations of the Code of Conduct and the law. Thus, the Director-Defendants breached the Company's own Code of Conduct, are not disinterested, and demand is excused as to them.

213. Catalent has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or any others who were responsible for the wrongful conduct to attempt to recover for Catalent any part of the damages Catalent suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

214.     The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

215.     The acts complained of herein constitute violations of fiduciary duties owed by Catalent's officers and directors, and these acts are incapable of ratification.

216.     The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Catalent. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Catalent, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and,

therefore, excused.

217.   If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Catalent to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

218.   Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least eight of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM
### Against the Individual Defendants for Violations of Section 14(a) of the Exchange Act

219.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

220.   Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

221.   Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

222.    Under the direction and watch of the Director-Defendants, the 2022 Proxy Statement failed to disclose that, contrary to the 2022 Proxy Statement's descriptions of the Board's risk oversight function and the Audit Committee's responsibilities, the Board and its committees were not adequately exercising these functions, were causing and/or permitting the Company to issue false and misleading statements, and were not complying with the Code of Conduct.

223.    The 2022 Proxy Statement also failed to disclose that: (i) by prematurely recognizing revenue in violation of U.S. GAAP, the Company materially overstated its revenue and earnings; (ii) the Company had material weaknesses in its internal control over financial reporting, particularly as it pertained to revenue recognition; (iii) the Company falsely represented demand for its products while it knowingly sold more product to its direct customers than could be sold to healthcare providers and end customers; and (iv) the Company violated regulatory rules at key production facilities as a way to rapidly produce excess inventory, which was later used to inflate the Company's financial results through premature revenue recognition in violation of GAAP and/or stuffing its direct customers with this excess inventory. As a result, the Company's public statements were materially false and misleading at all relevant times.

224.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2022 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2022 Proxy Statement, including but not limited to, the election of Defendants Chiminski, Balachandran, Barber, Carroll, Classon, Crane, Greisch, Kreuzburg, Lucier, Maselli, Morel, Stahl, and Zippelius to the Board.

225.    The false and misleading elements of the 2022 Proxy Statement led to, among other things, the election of Defendants Chiminski, Balachandran, Barber, Carroll, Classon, Crane, Greisch, Kreuzburg, Lucier, Maselli, Morel, Stahl, and Zippelius to the Board, which allowed them to continue to breach their fiduciary duties to Catalent.

226.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2022 Proxy Statement.

227.    Plaintiff, on behalf of Catalent, has no adequate remedy at law.

## SECOND CLAIM
### Against the Individual Defendants for Breach of Fiduciary Duties

228.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

229.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Catalent's business and affairs.

230.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

231.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Catalent.

232.    In breach of their fiduciary duties, the Individual Defendants caused or permitted the Company to engage in the Facility Misconduct.

233.    Moreover, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements about Catalent's business, operations, and prospects.

Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (i) by prematurely recognizing revenue in violation of U.S. GAAP, the Company materially overstated its revenue and earnings; (ii) the Company had material weaknesses in its internal control over financial reporting, particularly as it pertained to revenue recognition; (iii) the Company falsely represented demand for its products while it knowingly sold more product to its direct customers than could be sold to healthcare providers and end customers; and (iv) the Company violated regulatory rules at key production facilities as a way to rapidly produce excess inventory, which was later used to inflate the Company's financial results through premature revenue recognition in violation of GAAP and/or stuffing its direct customers with this excess inventory. As a result, the Company's public statements were materially false and misleading at all relevant times.

234.    The Individual Defendants failed to correct and/or caused the Company to fail to correct the false and misleading statements and omissions of material fact, thus rendering them personally liable to the Company for breaching their fiduciary duties.

235.    Also in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

236.    In yet further breach of their fiduciary duties, during the Relevant Period, four of the Individual Defendants engaged in lucrative insider sales, netting proceeds of approximately $6.4 million, while the price of the Company's common stock was artificially inflated due to the false and misleading statements of material fact discussed herein.

237.    The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that

they failed to ascertain and to disclose such facts, even though such facts were available to them.

238.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

239.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

240.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Catalent has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

241.    Plaintiff, on behalf of Catalent, has no adequate remedy at law.

**THIRD CLAIM**
**Against the Individual Defendants for Unjust Enrichment**

242.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

243.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual

Defendants were unjustly enriched at the expense of, and to the detriment of, Catalent.

244.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Catalent that was tied to the performance or artificially inflated valuation of Catalent, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

245.    Plaintiff, as a shareholder and representative of Catalent, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breaches of their fiduciary duties.

246.    Plaintiff, on behalf of Catalent, has no adequate remedy at law.

## FOURTH CLAIM
### Against the Individual Defendants for Abuse of Control

247.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

248.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Catalent, for which they are legally responsible.

249.    As a direct and proximate result of the Individual Defendants' abuse of control, Catalent has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

250.    Plaintiff, on behalf of Catalent, has no adequate remedy at law.

## FIFTH CLAIM
### Against the Individual Defendants for Gross Mismanagement

251.    Plaintiff incorporates by reference and realleges each and every allegation set

forth above, as though fully set forth herein.

252.     By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Catalent in a manner consistent with the operations of a publicly-held corporation.

253.     As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Catalent has sustained and will continue to sustain significant damages.

254.     As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

255.     Plaintiff, on behalf of Catalent, has no adequate remedy at law.

## SIXTH CLAIM
### Against the Individual Defendants for Waste of Corporate Assets

256.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

257.     As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions (as evidenced, for example, by the Securities Class Action), to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

258.     As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

259.     Plaintiff, on behalf of Catalent, has no adequate remedy at law.

## SEVENTH CLAIM
### Against Defendants Chiminski, Maselli, and Castellano for Contribution Under Sections 10(b) and 21D of the Exchange Act

74

260.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

261.    Catalent and Defendants Chiminski, Maselli, and Castellano are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Chiminski's, Maselli's, and Castellano's willful and/or reckless violations of their obligations as officers and/or directors of Catalent.

262.    Defendants Chiminski, Maselli, and Castellano, because of their positions of control and authority as officers and/or directors of Catalent, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Catalent, including the wrongful acts complained of herein and in the Securities Class Action.

263.    Accordingly, Defendants Chiminski, Maselli, and Castellano are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

146.    As such, Catalent is entitled to receive all appropriate contribution or indemnification from Defendants Chiminski, Maselli, and Castellano.

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)     Declaring that Plaintiff may maintain this action on behalf of Catalent, and

that Plaintiff is an adequate representative of the Company;

(b)     Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Catalent;

(c)     Determining and awarding to Catalent the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing Catalent and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Catalent and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Catalent to nominate at least eight candidates for election to the Board;

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

(e)     Awarding Catalent restitution from the Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury.

Dated: September 5, 2023

**PAWAR LAW GROUP, P.C.**

By: */s/ Vik Pawar*
Vik Pawar
20 Vesey Street, Suite 1410
New York, New York 10007
Telephone: (212) 571-0805
Facsimile: (212) 571-0938
Email: vikrantpawaresq@gmail.com

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

**BRONSTEIN, GEWIRTZ & GROSSMAN, LLC**
Peretz Bronstein
Eitan Kimelman
60 East 42nd Street, Suite 4600
New York, NY 10165
Telephone: (212) 697-6484
Facsimile: (212) 697-7296
Email: peretz@bgandg.com
        eitank@bgandg.com

*Counsel for Plaintiff*